## In re Anonymous No. 57 D.B. 78

Disciplinary Board Docket no. 57 D.B. 78.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

HENRY, *Board Member*, September 14, 1979— Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania

(board), submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

This matter arises under a petition for discipline that was filed on November 6, 1978, alleging that respondent attorney unreasonably delayed the settlement of two related estates in violation of Disciplinary Rules 6-101(A)(3) (neglect of a legal matter); 7-101(A)(2) (intentionally failing to carry out a contract of employment); 7-101(A)(3) (intentionally prejudicing or damaging a client); and 9-102(B)(3) (failure to maintain complete records and render appropriate accounts). No answer was filed and the matter was referred to hearing committee [  ] consisting of [  ] Esq., Chairman, [  ] Esq. and [  ] Esq. A hearing on the charges was held on February 27, 1979, at which respondent represented himself. Following an initial determination that the disciplinary rules had been violated, the committee reconvened on the same day to hear additional testimony with respect to the type of discipline to be imposed. On June 5, 1979, the committee filed its report finding that [Respondent] had neglected a legal matter entrusted to him in violation of Disciplinary Rule 6-101(A)(3) and recommending public censure. No exceptions have been filed and the matter was referred to this board for review and recommendation to your honorable court.

## II. FINDINGS OF FACT

The findings of fact and conclusions of law by the hearing committee are supported by the evidence and adopted by this board. The factual situation

can be summarized as follows: During her lifetime, [A] conveyed her residence in [   ], Pennsylvania to her brother [B], retaining a life estate. [B] died intestate on December 20, 1967. At the time of his death, his only asset was his remainder interest in the premises conveyed to him and occupied by his sister, [A]. [A] died on April 4, 1972, leaving a will in which she named respondent as executor. Letters testamentary were granted to [Respondent] on April 11, 1972. The intestate heirs of [B] agreed to renounce their right to administer his estate in favor of respondent and on July 18, 1972, letters of administration for the [B] Estate were to issued to [Respondent]. The [   ] residence was sold on December 7, 1972, and the proceeds deposited in the checking account for the [B] Estate. At the time of her death, [A] had $487.96 in cash, minimal household furnishings, three savings accounts, two of which were in joint names with her sister and two nieces and one of which was in joint names with her sister alone, and her interest as one of the intestate heirs of her brother, [B].

[Respondent], based upon his knowledge of the factual situation, was convinced that the joint bank accounts were "convenience accounts" and that the proceeds were properly payable to the estate and not to the surviving joint owners. The two accounts in joint names with [A]'s sister and nieces were closed out at his direction by April 20, 1972, and the proceeds deposited in the [A] Estate account. Respondent was unsuccessful in his attempt to withdraw the funds from the third account, the bank insisting upon the consent of the purported joint owner, the surviving sister of decedent.

[Respondent] had received notices in both estates from the Pennsylvania Department of Revenue on March 4, 1974, and the Bureau of County Collec-

tions on March 22, 1974, that the inheritance taxes were delinquent and legal action would be taken if prompt attention was not given to the matters. On June 11, 1974, respondent filed Form RCC-62 and paid the inheritance tax and interest owing with respect to the [B] Estate. On that same date he filed form RCC-33 and paid inheritance tax and interest for the [A] Estate. [Respondent]'s only defense to the delay was that he had no funds in the [B] Estate until the real estate was sold in December of 1972 and that he had difficulty resolving the taxability of the joint accounts and [A]'s interest in the residence as a transfer with a retained life interest and again as an intestate heir of her brother's estate. From June 11, 1974, until the time of the hearing on February 27, 1979, nothing further had been done with respect to either estate despite numerous inquiries and requests from the heirs.

## III. DISCUSSION

The record establishes without contradiction that respondent has delayed in carrying out his responsibilities as a personal representative and attorney for the two related estates of [B] and [A] for seven years. While there were questions to be resolved with respect to the disposition of assets and inheritance tax liability, none of these issues were sufficiently complicated or difficult to prevent meeting the deadlines imposed by law for paying the taxes or to extend the time for concluding the administration of these estates beyond that normally required. While respondent advanced several reasons for his procrastination to the heirs and others, he subsequently admitted that these were not the real sources of his problem but merely "crutches." [Respondent] candidly stated,

". . . I suspect that in the first instance if I didn't have the problem with the account in [   ] and I had relatively little difficulty in getting the names and addresses of these heirs, that I would have disposed of this estate within a relatively short period of time, possibly within a year following the time it came into my office.

This is one of those cases that poses peculiar problems; at least it did to me. And this is one of the easiest cases, at least in my office, to put aside.

Every office that I know about, or certainly every single practitioner, has a group of what he considers to be 'dogs'; and this is what I considered to be a 'dog.' You just have to make a conscious effort to get to cases like this, because you know there are problems there, and you know it is not going to be easy to resolve; and so there is a very strong tendency to work on something that has to be out tomorrow or the next day or next week or to let the pressure of other business permit you to defer this type of thing for another week. You will get to this a week later, or then it gets to be a month later. And then it gets to be two months later. That's the way it happens.

That's the way it happens to me. I don't say that that's the way it happens to everybody or to every representative group; but that's what happens to me."

This is not a case in which the attorney's lack of interest was shared by the parties involved. [C], one of the heirs, sent a handwritten letter to her brother which was forwarded to the respondent on January 27, 1976, itemizing her attempts to have the estates concluded.

"Dear [D],
Here is a list of letters & telephone calls made to [Respondent].

I wrote 1st letter on 9-25-74 asking for latest development in regards to Uncle [B]'s & Aunt [A]'s estate. Also told him Aunt [E] wrote to him before me and she received no answer. I also received no reply.

I called 10-26-74 at 4:00 P.M. spoke to him and was told that each person was to receive a letter about disposition of property some time next week. *No letter came.*

I called again 12-13-74 @ 10:45 A.M. I spoke to him was told he got tied up in 2 or 3 different matters, but should hear from him by Tuesday of next week.

Nothing came.

[   ] called on Sat. 2-22-75. He was not in, secretary answered phone.

I called on Wed. 2-26-75 @ 4:45 P.M. He was not in, secretary answered.

I called person to person on 3-3-75 @ 4:35 P.M. was told he was not in.

I called on 3-4-75 @ 4:40 P.M. He was not in, was told to call Person to Person and was also told he would call that evening. He did not call.

I called Person to Person on 3-6-75 @ 3:00 P.M. was told to call about 4:45 P.M. When I called @ 4:45 P.M. was told he did not return.

I called on 3-10-75 @ 4:45 P.M. to make appointment to talk to him. Secretary said he's in & out of the office therefore she couldn't give me an appointment. Was also told he lost my telephone number and couldn't find it. I gave her my number and she said she would give it to him and he will call. He did not call.

I called on 3-13-75 @ 4:50 P.M. wanted to make appointment but was told by sec. he would call Sat. 3-15-75 between 10:00 and 11:00 A.M. He did *not call then.*

On Tues. 4-22-75 [F] and I flew via [ ] to [ ]. We arrived at [Respondent]'s office about 11:30 A.M. He was in and we spoke to him. He had difficult time locating the files of [B] & [A]. We were told the house was sold for $8000 in December of 1972. He said he had difficulty getting in touch with [H]. We assured him we would get correct address and send it to him. I asked him to write to Uncle [G] to assure him he's working on the estate. He said he would get in touch with him, but as far as I know [G] heard nothing from him.

On 5-5-75 I wrote to him giving him correct address of [H].

I wrote another letter on 8-18-75 telling him I'm disappointed that he didn't write letter to Uncle [G] as he promised. Also asked him am I to assume that we are being put off? *No reply from him.*

I called on 9-5-75 @ about 4:30 P.M. He was not in. I asked Secretary if he read my letter of 8-18-75 and she said she does not open his mail. She didn't see letter from [ ]. (The writer's home town.)

I called on 10-20-75 @ 8:47 Woman answered that he is not in . . ."

[Respondent] put aside the work in these estates in favor of what he considered to be more important and certainly more lucrative services for the local sewer authority. Respondent has belatedly recognized that these excuses do not justify his action and that he should not have accepted this representation if he was unable to handle it or should have referred it to someone else when it became apparent that there were other demands upon his time. Upon reviewing the record, the hearing committee concluded that respondent did maintain complete records of the funds which came into his possession and did not misuse or misappropriate

any of the estate property. They also concluded that [Respondent]'s action did not constitute violation of Disciplinary Rules 7-101(A)(2) and (3) because his actions were not intentional in the sense that he deliberately and knowingly formed an intent to refrain from acting. They did rule, however, that respondent was negligent in his handling of these estates in violation of Rule 6-101(A)(3) and recommended that [Respondent] receive a public censure.

The frustration and irritation experienced by [C] as graphically expressed in her letter is not, in all likelihood, confined to [Respondent] but extends to the legal profession generally. It is improbable that [C], her other relatives involved in these estates and anyone with whom they have shared their grievances will ever regain their respect and confidence in attorneys. The importance of maintaining the image of the legal profession does not stem from concern for lawyers themselves. As an integral part of our nation's legal system, skepticism and distrust of lawyers becomes transformed into a similar attitude towards that system and undermines the rule of law. The consequences of [Respondents'] misconduct are most grave and we believe he should be disciplined accordingly.

It should be noted that the present charge is not an isolated case insofar as [Respondent]'s practice is concerned. On February 14, 1978, he received two informal admonitions from chief disciplinary counsel. The first invovled a case in which he retained the sum of $300 from a real estate settlement to bring an action to quiet title which was never commenced. The second involved his failure to continue the representation of a client who was a defendant in a civil suit which resulted in a default

judgment being entered against the client. Significantly, his neglect of the [B] and [A] Estates continued after he was disciplined. While the board considers [Respondent]'s transgressions to be extremely serious, we do not feel that they rise to the level that would require him to forfeit his right to practice law by suspension. We have also considered and rejected the possibility that [Respondent] would be a proper subject for probation and concur unanimously in the recommendation of the hearing committee that he receive a public censure by your honorable court.

## IV. RECOMMENDATION

For reasons set forth above, the Disciplinary Board recommends to your honorable court that respondent, [    ], be publicly censured pursuant to Rule 204(3) of the Pennsylvania Rules of Disciplinary Enforcement.

## ORDER

And now, October 15, 1979, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated September 14, 1979, is accepted; and it is ordered that [Respondent] be subjected to public censure by the Supreme Court, as provided for in Rule 204(3) of the Rules of Disciplinary Enforcement, at the session of this court commencing November 12, 1979, at Philadelphia.